Filed 9/28/16  Allen v. OneUnited Bank  CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TRACY ALLEN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>ONEUNITED BANK,<br><br>    Defendant and Respondent. | B261282<br><br>(Los Angeles County<br>Super. Ct. No. BC385406) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rafael A. Ongkeko, Judge.  Affirmed.

Daniel M. Graham for Plaintiff and Appellant.

Law Offices of Parnell Fox and Parnell Fox for Defendant and Respondent.

Plaintiff and appellant Tracy Allen appeals from the judgment entered in favor of defendant and respondent OneUnited Bank (the Bank) following a jury trial in this action for wrongful termination in violation of public policy. Plaintiff contends the trial court made multiple evidentiary errors that resulted in the denial of a fair trial, substantial evidence does not support the jury's verdict, and the trial court erroneously denied her posttrial motions for judgment notwithstanding the verdict (JNOV) and for a new trial. We affirm the judgment.

## FACTUAL BACKGROUND

Plaintiff began working for the Bank in October 2004 as vice president of the loan origination department. Her duties included managing and directing the underwriting, processing, and funding of loan applications and overseeing a staff of underwriters in three states. Plaintiff also worked with the Bank's internal audit department, which audited loan application files and generated monthly reports of loan file errors. Plaintiff was responsible for reviewing the monthly reports, communicating her agreement or disagreement with the report findings, and correcting the errors.

Plaintiff participated in two Federal Deposit Insurance Corporation (FDIC) audits of the Bank's operations in July 2006 and August 2006. During those audits, plaintiff met with FDIC examiners to review errors the examiners found in the Bank's loan application files. The examiners' findings were documented in confidential FDIC reports of examination compliance.

Between July 2006 and February 2007, the Bank was involved in a wage dispute with a former employee named Wesley Grant (Grant), who had worked under plaintiff's supervision. The dispute concerned a bonus that had allegedly been promised to Grant when he was first hired by the Bank. In September 2016, shortly before a Department of Labor Enforcement hearing on the matter, the Bank's human resource manager, Kimmie Jackson (Jackson), asked plaintiff to draft a memo addressing Grant's claims. Plaintiff did so and attended but did not testify at the February 7, 2007 wage hearing. The Bank eventually settled the dispute with Grant.

Plaintiff's employment with the Bank was terminated on February 15, 2007. She commenced this action against the Bank in February 2008 for wrongful discharge in violation of public policy, claiming that her employment was terminated because she refused to give false testimony at Grant's February 7, 2007 wage hearing and because she "had voiced substantial opposition and complaints regarding the BANK's lending practices," including the lack of fixed lending criteria, and violations of the Truth in Lending Act (15 U.S.C. § 1691 et seq.) and Regulation Z (12 C.F.R. § 202 et seq.).

The matter proceeded to a four-day jury trial. At the conclusion of the trial, the jury returned a special verdict form in which they found that the Bank had not wrongfully terminated plaintiff's employment either because she reported illegal lending practices or because she refused to give false testimony at Grant's wage hearing.

The trial court denied plaintiff's motions for judgment notwithstanding the verdict and for a new trial. Plaintiff appeals from the judgment entered on the jury verdict.

## DISCUSSION

### I. Sufficiency of the evidence

#### A. *Standard of review*

When a party challenges the sufficiency of the evidence supporting a jury verdict, we apply the substantial evidence standard of review. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.) Under this standard, "[a]ll conflicts in the evidence are resolved in favor of the prevailing party, and all reasonable inferences are drawn in a manner that upholds the verdict. [Citations.]" (*Holmes v. Lerner* (1999) 74 Cal.App.4th 442, 445.) "[W]e do not evaluate the credibility of the witnesses or otherwise reweigh the evidence. [Citation.] Rather, 'we defer to the trier of fact on issues of credibility. [Citation.]' [Citation.]" (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514-515.) "Substantial" evidence is that which is of "'"ponderable legal significance,"'" "'"reasonable in nature, credible, and of solid value . . . ."'" [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) The testimony of a single witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

3

### B. *Substantial evidence supports the jury verdict*

Substantial evidence supports the jury's verdict that the Bank did not wrongfully terminate plaintiff's employment either because she reported illegal lending practices or because she refused to give false testimony at Grant's wage hearing.

#### 1. Evidence of the Bank's downsizing

The evidence showed that plaintiff's position, among other positions at the Bank, was eliminated as part of an overall reduction in lending personnel following a dramatic decrease in the Bank's loan volume. The Bank's president and chief operating officer, Teri Williams (Williams), testified that as the result of an increase in interest rates, the Bank's loan portfolio decreased from $150 million in 2006 to $3 million in 2007. Given the decrease in loan volume, Williams and a group of senior managers decided to reduce staffing in the Bank. In December 2006, Williams worked with plaintiff to identify positions to be eliminated in the loan origination department, and plaintiff selected the employees to be laid off in that department. After the December 2006 layoffs, only 10 employees remained in the loan origination department.

Plaintiff acknowledged in a January 2007 email that the Bank had undergone a "reduction in force" and that there were "no loans in the system." Only one or two loans were being processed in January 2007, and only one loan closed in February 2007. In contrast, 16 loans had closed in January of the previous year.

By February 2007, only five employees remained in the loan origination department, including plaintiff, her assistant vice president, and a few staff. Plaintiff and her assistant vice president were both laid off on February 15, 2007, and received the same reduction in force forms given to other previously terminated employees.

At the end of February 2007, only two active employees remained in the loan origination department. Work on pending loan applications was absorbed by the Bank's vice president of loan services and the remaining loan processors.

#### 2. Evidence that plaintiff never complained of illegal lending activity

There is substantial evidence in the record that contradicts plaintiff's claim that she reported illegal lending practices and that her employment was terminated for doing

4

so.  Sonia Lee, the vice president of the Bank's internal audit department, testified that she was the appropriate person to whom employees would report any illegal lending practices.  She worked in the same building as plaintiff, and provided plaintiff with monthly reports of errors found in loan files.  Plaintiff never reported any illegal lending practices to Lee.

Jackson, the Bank's vice president of human resources, testified that she was the appropriate person to whom employees would report problems concerning their employment.  Plaintiff never raised any problems or complaints with her.

Plaintiff herself admitted during her trial testimony that between August 2006 and the termination of her employment in February 2007 she never complained to or told the FDIC about any illegal activity at the Bank.

### 3.  Evidence that plaintiff was not instructed to testify falsely

Substantial evidence also contradicts plaintiff's claim that she was discharged for refusing to testify falsely at Grant's February 2007 wage hearing.  Plaintiff claims that Jackson and the Bank's general counsel, Robert Cooper (Cooper), pressured her to make false statements in memoranda she prepared concerning the Grant dispute and in anticipated testimony she was to give at the wage hearing.  Plaintiff further claims that she repeatedly voiced her refusal to do so.  Cooper and Jackson both testified, however, that plaintiff was never instructed to lie, either in the memos or at the wage hearing.  Cooper and Jackson further testified that plaintiff never said anything about lying or refusing to lie at the wage hearing.

Substantial evidence supports the jury's finding that the Bank did not wrongfully terminate plaintiff's employment because she refused to give false testimony at the wage hearing or because she reported illegal lending practices.

## II.  Alleged evidentiary errors

Plaintiff contends the trial court committed prejudicial error by excluding the FDIC examination reports from evidence, by precluding her expert witness from testifying, by allowing the Bank's general counsel to testify at trial despite the Bank's

5

refusal to make him available for deposition, and by allowing the Bank to conceal a material witness statement until after the close of evidence.

### A. *Standard of review*

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.) An abuse of discretion occurs only when the trial court's ruling exceeds the bounds of reason, taking into consideration all of the circumstances. (*Ibid.*)

### B. *Exclusion of FDIC reports*

Before the trial commenced, the trial court denied a motion in limine by the Bank to exclude the FDIC examination reports. The trial court made clear, however, that plaintiff's presentation could not "be a rehash of the FDIC investigation" and that the court would consider the evidence on a case-by-case basis to determine its relevance to plaintiff's claim that she was discharged for objecting to the Bank's illegal lending practices.

During the trial, plaintiff's counsel was allowed to question witnesses about the examination reports. Counsel was prohibited from publishing the reports to the jury, however, because the reports discussed violations found by the FDIC that were not relevant to the Bank's lending practices or to plaintiff's wrongful discharge claim.

For example, plaintiff's counsel questioned Williams, the Bank's president and chief operating officer, about Home Mortgage Disclosure Act (HDMA) violations the FDIC discussed in its July 2006 examination report. Williams explained the ministerial nature of those violations, which involved formatting errors in recording data from customer home loan applications:

> "[T]here were errors in -- a loan file has about, you know, hundreds of fields. And in a couple of cases, the fields were reported inaccurately. So, as an example, . . . if . . . the purpose of the loan is to purchase a property, it's a rated -- not rated. The field is two. If it's to refinance a property, it's three. If it's to do a cash-out refinance, it's four . . . . If any of those fields are inaccurate, that's . . . what the FDIC would call a violation."

6

The trial court denied plaintiff's request to publish the FDIC report to the jury and explained its reason for doing so in a subsequent sidebar conference with counsel:

> "THE COURT: These are nothing to do with lending criteria. These are ministerial errors that any bank might have. That's the testimony that I seem to get. Now, your client may have a different take on it. But you haven't really laid the foundation to have that nexus to the underlying public policy issue. . . . Any statement needs to be a -- within the nexus that you're trying to draw here. And if it's -- if these are reporting errors that don't have anything to do with the fixed lending criteria, maybe it's the lending criteria that's important. I don't know. That hasn't been established. So the relevance to me is not there yet. . . .
>
> "[PLAINTIFF'S COUNSEL]: Okay. As I understand it, the court's earlier ruling on the motion in limine, your Honor, we're not just limited to the words fixed lending criteria. I mean, there's multiple rules and regulations that have been disclosed during the course of this action that were subject to the public policy violation.
>
> "THE COURT: But you're saying everything is. And I disagree with that. You're saying everything that the FDIC dinged them for that Ms. Allen was involved in was in and of itself a -- should come under the whistleblower protection. I don't think so. So you have to pick and choose whatever it is you really want. It's not a shotgun case. You need to decide what these are. Because Ms. Allen participated voluntarily. The FDIC came to her. And she did it as part of the course and scope of her job to be part of this. Now, if there's anything else contrary to that, issues that show look, these are concerns and Ms. Allen said this is a real problem here and our bank has a real problem and et cetera and et cetera, I don't know. You have a lot of documents here. And it will take us months to go through this if you're going to do that. So you need to decide what it is you're going to focus on."

Plaintiff also testified about the July 2006 FDIC audit report and her communications with the FDIC examiners during the July 2006 audit. She discussed the HDMA reporting errors that were the subject of Williams's prior testimony; errors in providing loan applicants with the correct address for the FDIC consumer response center; and errors in the good faith estimates provided to loan applicants for credit report fees, title insurance, and hazard insurance. Plaintiff testified that she discussed these errors with the FDIC examiners and explained to them the challenges she faced in correcting those errors because of budgetary restrictions and the lack of qualified staff.

7

After plaintiff's testimony, her counsel renewed the request to publish the FDIC report to the jury. The trial court again denied the request, noting that "[t]hese are ministerial issues, reporting issues that the bank, the FDIC likes to have. . . . [T]hey are still looking at whether or not certain boxes were checked and numbers entered correctly." When plaintiff's counsel argued that the errors were violations of federal law, the trial court responded: "There are lots of laws out there." "Just because they are banking related doesn't mean that they are fundamental public policy issues."

Plaintiff fails to demonstrate how any of the compliance errors listed in the FDIC reports are relevant to her claim of wrongful discharge in violation of public policy. She does not explain how those compliance errors -- which appear to have been clerical or ministerial in nature -- constitute illegal lending practices. Plaintiff also fails to establish any causal nexus between the violations listed in the FDIC reports and the termination of her employment. The evidence showed that plaintiff voiced no complaints about FDIC violations or illegal lending practices to any of the Bank's internal compliance officers. Plaintiff herself admitted during her testimony at trial that between the August 2006 FDIC audit and the termination of her employment in February 2007, she never told the FDIC about any illegal activity by the Bank.

It is an appellant's "burden on appeal to affirmatively challenge the trial court's evidentiary ruling, and demonstrate the court's error." (*Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.) Plaintiff failed to meet that burden with regard to the ruling prohibiting publication of the FDIC reports to the jury.

### C. *Expert witness*

Plaintiff contends the trial court erred by precluding expert testimony by Gordon Bosserman (Bosserman), the attorney who represented Grant in his wage dispute with the Bank, on the ground that plaintiff had withdrawn Bosserman as an expert witness. The record supports the trial court's conclusion that plaintiff withdrew Bosserman as an expert during a pretrial conference that was not transcribed by a court reporter. The court then scheduled a 15-minute hearing under Evidence Code section 402 on Grant's

8

qualifications as an expert. The parties discussed that hearing on the record on September 16, 2014:

> "THE COURT: We were going to do a 15-minute 402; is that on Mr. Grant?
>
> "[PLAINTIFF'S COUNSEL]: On Mr. Grant. If he testifies to any expert opinions. That was the 402, as I understand it, was --
>
> "THE COURT: He should be here at 9:00 o'clock then."

At the Evidence Code section 402 hearing held the following day, plaintiff presented Bosserman as an expert on employment matters. The Bank objected on the ground that plaintiff had previously withdrawn Bosserman as an expert. The trial court agreed, referring to its notes from the pretrial conference:

> "THE COURT: That's not what I understood the -- his role was going to be based on our pre-voir dire conference. . . . I have it written down here.
>
> "[BANK'S COUNSEL]: 402 on Grant and for Bosserman --
>
> "THE COURT: No 402 needed."[1]

The trial court went on to state: "The best that I can do at this point is to rely on what occurred last week. And unfortunately, we didn't have a court reporter. But I have crossed out Mr. Bosserman's expert witness, under the column type of witness. I'm just going to read this. It says Gordon Bosserman, attorney percipient witness, non-retained expert witness. And then the part about non-retained expert, I crossed that out. And you had agreed only to call him as a percipient witness."

---

[1]  In his appellate brief, plaintiff's counsel misleadingly edits this colloquy by omitting portions of the reporter's transcript indicating that the sentence begun by the Bank's counsel regarding a "402 on Grant and for Bosserman --" was interrupted and then completed by the trial court as "No 402 needed." Plaintiff's counsel then cites the edited exchange as support for the false assertion that the Bank's counsel understood that *both* Grant and Bosserman would be the subjects of a section 402 hearing.

9

The Bank's counsel pointed out that her notes from the pretrial conference were consistent with those of the trial court: "[Y]our honor, we did reach a conclusion on Mr. Bosserman before court, and your notes and my notes match identically. He is a percipient witness, and there was a question mark on even that."

The trial court then stated its ruling as follows: "I think decisions during the pretrial phase are important. And unless there's another reason which I have not heard, such as . . . I blew it, or I didn't mean to say that, or it was inadvertent, we had a long discussion about all these witnesses, [counsel]. I think it's a total surprise. . . . [T]here's an objection here by the defense. And I have to go with my notes, and to spring this on this particular issue, you had . . . agreed to what I discussed earlier. And I need to hold you to that."

The record supports the conclusion that plaintiff withdrew Bosserman as an expert witness. The trial court's ruling precluding expert testimony from Bosserman was not an abuse of discretion.

### D.  *Testimony of Bank's general counsel*

Plaintiff contends the trial court abused its discretion by allowing the Bank's general counsel to testify at trial after the Bank refused to make him available for deposition.

The record shows that on November 2, 2010, the trial court heard plaintiff's motion to compel the depositions in Los Angeles of the Bank's persons most qualified (PMK). The trial court denied the motion and ruled that the depositions of the Bank's corporate officers, including its general counsel Cooper, take place in Boston and that the Bank pay for plaintiff's and her attorney's travel expenses.

Proceedings in the trial court were stayed from December 2010 until March 2013 while the case was removed to federal court. The case was remanded to state court on July 15, 2013. In January 2014, plaintiff's counsel requested dates from the Bank's counsel for the Bank's PMK depositions. After several email exchanges between counsel, plaintiff noticed Cooper's deposition in February 2014. Cooper initially agreed to appear for deposition in Los Angeles on March 13, 2014, but asked to postpone the

10

deposition because of the death of a family member and a medical injury he sustained that prevented him from flying to Los Angeles.  The Bank's counsel offered to make Cooper available for deposition in Boston between June 11 and June 18, 2014.  Plaintiff declined the offer on June 9, 2014, even though discovery was not set to close until August 18, 2014.  Plantiff's counsel instead indicated that he would move to preclude Cooper's testimony at trial.

On September 15, 2014, the trial court heard argument in an unrecorded hearing on plaintiff's motion in limine to preclude Cooper's testimony at trial for failure to appear at deposition.  The trial court ruled that Cooper could not testify until plaintiff had another opportunity to depose him.  The Bank made Cooper available for deposition on September 17, 2014, at 5:00 p.m.  Plaintiff again declined to depose him, and Cooper testified at trial without further objection from plaintiff.

Plaintiff's failure to object to Cooper's testimony at trial waived the objection she now seeks to raise on appeal.  It is well settled both by statute and case authority that failure to object, even to otherwise inadmissible evidence, waives the defect.  (Evid. Code, § 353; *Haskell v. Carli* (1987) 195 Cal.App.3d 124, 129; *Estate of Silverstein* (1984) 159 Cal.App.3d 221, 225.)  Even if plaintiff's pretrial motion in limine to preclude Cooper's testimony could be deemed an objection to his trial testimony, the trial court's ruling on that motion precluded Cooper from testifying only until plaintiff had the opportunity to depose him.  The Bank subsequently made Cooper available for deposition, but plaintiff declined to depose him.  Plaintiff's failure to depose Cooper before he testified waived any objection based on his unavailability for deposition.

### E.  *Alleged concealment of witness statement*

Plaintiff contends the trial court erred by allowing the Bank to intentionally conceal the existence of an unsigned statement prepared by plaintiff's former supervisor, Arman Walker (Walker).  The statement contains Walker's recollections of his interview of Grant and states that Walker never promised Grant that he would earn a bonus equaling his salary.

11

Existence of the Walker statement came to light during plaintiff's cross-examination of Jackson on September 18, 2014. Jackson testified that before the trial, she reviewed a memo prepared by Walker in connection with Grant's wage dispute claim, and plaintiff's counsel commented that he had not seen the memo.

The trial court raised with plaintiff's counsel the issue of nondisclosure of the Walker memo in a subsequent exchange outside the presence of the jury, and plaintiff's counsel indicated he would address the issue in final argument before the jury:

> "THE COURT: [M]s. Jackson said she saw an Arman Walker memo, which is apparently not disclosed or a surprise, whether it's an internal confidential memo specific to this case or a document that -- is there any issue with regard to that from the plaintiff's perspective?
>
> "[PLAINTIFF'S COUNSEL]: There will be in final argument.
>
> "THE COURT: Okay.
>
> "[BANK'S COUNSEL]: Okay.

That evening, the Bank determined that the Walker statement was an unsigned draft prepared by Walker on September 13, 2006, about the circumstances of Grant's hiring and the termination of Grant's employment. The Bank had inadvertently failed to produce the statement during discovery but voluntarily emailed the statement to plaintiff's counsel on the night of September 18, 2014. The Bank's counsel also verbally informed plaintiff's counsel, on the morning of September 19, 2014, that the statement had been emailed to him.

A party that is "surprised" by developments during trial is obliged to seek a continuance, move for a mistrial, or otherwise seek relief during the trial. (*Kaufman v. De Mutiis* (1948) 31 Cal.2d 429, 432.) Failure to do so may be held to constitute a waiver of the right to a new trial on that ground. (*Ibid.*) Upon discovery of the Walker memo, and even after the trial court's inquiry as to how plaintiff's counsel wished to proceed in light of the previously undisclosed memo, plaintiff's counsel did not seek a continuance, move for a mistrial, or seek any other relief during the course of the trial.

12

This resulted in a forfeiture of plaintiff's appellate challenge to the admission of the memo.

Even absent such forfeiture, plaintiff fails to demonstrate any prejudice. As the trial court noted in its ruling denying plaintiff's motion for a new trial, the contents of the Walker statement present no materially different set of facts that would have affected the evidence or the outcome of the trial.

## III. Posttrial motions

An order denying a motion for JNOV is appealable, but an appeal from that order must be filed within the time frames prescribed by rule 8.104(a) of the California Rules of Court. (Code Civ. Proc., §§ 629, 904.1, subd. (a)(4); Cal. Rules of Court, rule 8.104(a).) On her notice of appeal, plaintiff indicated only that she was appealing from the judgment after jury trial. She did not appeal from "[a]n order or judgment under Code of Civil Procedure section 904.1(a)(3)-(13)," nor did she otherwise identify her appeal as being from the trial court's order denying her motion for JNOV. That order is accordingly not at issue in this appeal. (See *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 158.)

An order denying a motion for a new trial is not directly appealable, but may be reviewed on appeal from the underlying judgment. (Code Civ. Proc., § 904.1; *Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 37, fn. 1.) The standard of review for denial of a new trial motion was stated by our Supreme Court as follows: "[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal. [Citations.] However, we are also mindful of the rule that on an appeal from the judgment it is our duty to review all rulings and proceedings involving the merits or affecting the judgment as substantially affecting the rights of a party [citation], including an order denying a new trial. In our review of such order *denying* a new trial, as distinguished from an order *granting* a new trial, we must fulfill our obligation of reviewing the entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial. [Citations.]" (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872.)

13

Plaintiff's arguments concerning the denial of her new trial motion are the same as those she raises to challenge the jury verdict and the trial court's evidentiary rulings. Our review of the record leads us to conclude that plaintiff has failed to demonstrate any entitlement to a new trial.

## DISPOSITION

The judgment is affirmed. The Bank is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

14